## PUBLIC UTILITIES CORPORATION OF ARKANSAS v. OLIVER.

### No. 9486.

Circuit Court of Appeals, Eighth Circuit.
Feb. 28, 1933.

C. E. Wright, of El Dorado, Ark. (J. K. Mahony and H. S. Yocum, both of El Dorado, Ark., on the brief), for appellant.

Walter L. Brown, of El Dorado, Ark. (H. C. Steinberg, of El Dorado, Ark., on the brief), for appellee.

Before STONE, VAN VALKENBURGH, and BOOTH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

Appellant is a public utility company engaged in the business of laying lines for the

transmission of gas along the streets and alleys of the city of El Dorado, Ark., in making meter installations, and in furnishing and supplying gas for domestic use to the consumers of said city. The appellee, Dora Oliver, with her husband, Otis Oliver, and her children, resided in a two-story frame dwelling numbered 419 Florence avenue in said city of El Dorado. On or about August or September, 1928, appellee and her husband ordered gas service from appellant, and connection was duly made. A gas line was installed from the street to the dwelling which was furnished by appellant with all pipe connections, fixtures, appliances, meter, etc., necessary for the use of natural gas in the building. A witness for the defense testified that the company was to install the service line, which, upon installation, was to become the property of the Olivers; but appellee testified that the appellant company was to keep the service line, as well as the regulator and meter, "repaired and in good shape." Appellee and her husband continued to be customers of appellant as consumers of natural gas until on or about December 20, 1929. On that date, between the hours of 5 o'clock and 7 o'clock in the evening, she went to the kitchen of her dwelling to prepare the evening meal. Upon striking a match to light the cookstove a terrific explosion occurred, and a fire followed, which resulted in the complete loss of the building and contents and in severe injuries to appellee, who was confined to hospital for approximately ten and one-half months thereafter. As a result of the severe burns which she sustained, it was found necessary to amputate her left arm between the elbow and wrist; her right arm is bent back and rendered permanently useless; her eyelids are everted and bent upwards by the structure of the skin following a deep burn; she cannot close her eyes, and her vision is somewhat impaired; she is unable to feed or dress herself; she has suffered, and will probably continue to suffer, a great deal of pain in the future; her appearance has been rendered very unsightly by scars and discolorations, and by the condition of her eyes. She sued appellant in the District Court for the Western District of Arkansas for her injuries so suffered. The trial resulted in a verdict and judgment in her favor in the sum of $14,000. In her amended and substituted complaint, appellee alleged the following grounds of negligence:

"1. That the defendant, through its agents, servants, and employees, connected this house off a direct high pressure feed line, maintained by defendant instead of an intermediate pressure line, to reduce the gas pressure, because of which fact the high pressure line that was connected by the defendant, as aforesaid, to the house, as aforesaid, carried a pressure of 25 pounds to 75 pounds of gas directly through the line, as aforesaid, to the regulator installed near the meter; that this heavy pressure forced gas through the different line connections near the meter and between the small regulator near the meter and the street, also, through the connections between the regulator and the house, and also from the meter itself causing a leakage of gas, as aforesaid.

"2. That the defendant carelessly and negligently supplied gas to the house, as aforesaid, through a high pressure line, as aforesaid, and carelessly and negligently failed to provide a regulator with proper equipment to reduce the pressure of gas before transmitting it to the premises and house occupied by the plaintiff; that defendant's neglect in this respect consisted in not equipping the regulator installed with a safety valve or 'Mercury Seal.'

"3. That due to the fact defendant had carelessly and negligently failed to equip the regulator with a safety valve or 'Mercury Seal,' as aforesaid, this heavy and excessive pressure of gas passed through the meter and into the house line causing an unusual and tremendous pressure of gas against the stove valve and also causing a heavy leakage of gas around the diaphragm of the meter itself and through the pipe connections, as aforesaid.

"4. That the defendant carelessly and negligently failed to stop the leakage of gas in the line connections and meter, as aforesaid, which line connections and meter were the property of the defendant and furnished by it, as aforesaid, for the purpose of supplying gas to this plaintiff, as aforesaid, and also defendant carelessly and negligently failed to fix the regulator and equip the same with a proper safety valve or 'Mercury Seal.'

"5. That knowledge of the leakage, as aforesaid, was conveyed to the defendant, its servants, agents and employees within a reasonable time prior to the explosion. That it was the duty of the defendant to reduce the pressure of gas on the said line and its connections before transmitting it into the house occupied by the plaintiff and to make the same reasonably safe for use; and, that it was the duty of the defendant to make the necessary repairs to stop the leakage of gas and to reduce the pressure be-

fore transmitting it through the meter valve, which duty the defendant failed to discharge."

Appellant denied these allegations specifically, and alleged contributory negligence in the following language: "If gas escaped and accumulated in the building as alleged by the plaintiff, that the plaintiff knew thereof and appreciated the danger, or, by the exercise of reasonable care for her own safety, could have known thereof and appreciated the danger, and she was careless and negligent in igniting said gas and being in a position of danger when the same was ignited."

The specifications of error relied on are, with one exception, founded on the admission of alleged incompetent testimony. That exception is to the following portion of the court's charge: "Now, if you find for the plaintiff, you will award her such damages as she has sustained, those damages being loss of earning power, doctor bill, hospital bill, pain and suffering that she has endured up to the present time by reason of her injury, and such additional pain and suffering as she may endure in the future."

Neither by assignments of error nor by specifications relied upon does appellant challenge the sufficiency of the evidence to support the judgment. Examination of the record discloses that there is much conflict in the testimony, but that the verdict of the jury and the resulting judgment have ample substantial support. Our discussion, therefore, will be confined to a consideration of the points specifically relied upon for reversal.

In the course of examination of the witness George Archibald, plaintiff sought to show in what manner gas from leakages at the connection near the meter, installed near the outside wall of the house where the kitchen was located, could find its way inside the house and cause the explosion. A step to this end was to show the existence of holes, crevices, or apertures in the wall of the house at or near that point. This witness, a former employee of appellant, had charge of the installation of this meter. He was asked this question: "Q. Now when you installed the lines there and joined the stoves inside the house, how did you get those lines into the house, what kind of openings did you make? A. Well, at times we drilled a hole in the house, and there was times we used knot holes, and just most any way you could get it in."

Further on is found this testimony which is the basis of additional error assigned:

"Q. Now, in installing gas did you occasionally in houses of that kind make openings with an axe?

"Mr. Yocum: We object.

"The Court: Overruled.

"Mr. Yocum: Exception.

"A. Yes, we have knocked a knot out of a board at times, like I tell you, we got it in there practically any way we could. Lots of times we would not have an auger and just knock a knot out of a board right close to the floor, and put the line in through there."

While this testimony did not fix the precise manner in which the gas entered this house, described in the record as a mere "shack," or board house with two rooms, its admission was productive of no prejudice to appellant, because it is beyond dispute that gas did enter the house, and it is immaterial that the method of installing the meter, and making the necessary connections therewith, may or may not have left openings in the wall through which gas might have entered. It was expressly stated and ruled that this evidence was neither offered nor received for the purpose of connecting appellant with negligence in making the openings, but simply to show the possibility that gas escaping from the meter might enter the house. This same witness testified further that he was at the Oliver shack December 20, 1929, that he read the meter on that day, and that appellee said there was something wrong with the gas, and that she had notified the company. He discovered that there was a leak, and that gas was seeping through the cork gasket around the meter.

One of the allegations of negligence charged against appellant was that it carelessly and negligently supplied gas to appellee's house through a high-pressure line, and failed to provide a regulator with proper equipment to reduce the pressure of gas to a safety point before transmitting it to the Oliver premises; that the regulator installed should have been equipped with a safety valve or "Mercury Seal." It appears that the natural gas furnished to houses along Florence avenue, where appellee lived, was carried through a six-inch main under a pressure of from twenty to thirty pounds. This is referred to as a high-pressure main. The greater part of the city had so-called intermediate mains into which the gas was admitted through regulators, and to which the service lines to the houses were connected. In these intermediate mains the pressure maintained was from four to five pounds.

In the business district, or fire zone, of the city, low-pressure mains carried a pressure not exceeding eight ounces.

J. A. Chinn, a witness for appellee, was until December, 1929, superintendent of the gas company that distributed gas in the city of El Dorado. He testified that the six-inch main on Florence avenue had been tapped to serve domestic consumers, and this was contrary to the general practice of the gas company. The following testimony with respect to this action was given: "Q. Well, if there was any objection to it, state to the jury what those were? A. At that time the pressure in that line was around ten to fifteen pounds. I say there was two gas companies here and we did not have to furnish but about half the gas to the city, so we didn't need to carry a very high pressure, and the balance we had for that installation, when the pressure became greater than that, that wasn't sufficient to do the work. We did not have the right regulators to put in there."

Counsel for appellant then asked that this evidence be excluded, largely on the ground that it invaded the province of the jury. His motion was overruled, an exception preserved, and errors assigned to this ruling. The court held that the ultimate question was still preserved for the decision of the jury, and that the testimony was competent in view of the experience of the witness, who was testifying with respect to a fact involving the sufficiency of the regulator to control pressure on the high-pressure main. In this ruling we think the trial court was right. Further on in his examination this witness testified as follows:

"Q. I will ask you this question: Would that regulator as installed with a seven-sixteenths orifice, I will ask you if by equipping that particular regulator that was there at the time of the explosion and was placed there by your company, if that regulator had been equipped with a mercury seal, if that would have protected the consumer? A. Yes, sir, there would have been no high pressure gas going into the meter, or the service line.

"Q. So you say all that would have been necessary would have been to have done what? To equip it with that mercury seal?"

Counsel for appellant then objected. The objection was overruled—we think correctly—and motion to strike followed. On cross-examination this occurred:

"Q. (by counsel for appellant) I want to know what you claim should have been done to this particular regulator? A. To make that regulator work, and to make it safe, it should have a smaller orifice and also a mercury seal.

"Q. And it took both of those to make it safe? A. Yes, sir."

The court properly refused to exclude this testimony thus elicited by counsel for appellant on cross-examination.

In the direct examination of C. B. Wheelis, witness for appellant, the question of making repairs by the gas company was discussed, and, on cross-examination in response to questions by counsel for appellee, the witness stated that the only time the company ever repaired leaks was "during the days of soliciting," and that, in case of danger, when notified, it was "supposed to cut this gas out at the curb, discontinue the service until repairs were made by the property owners." The objection that this was not proper cross-examination was correctly overruled. Furthermore, upon the entire record we do not perceive that any of these admissions of testimony affected the substantial rights of the parties. The crucial facts were established by abundant testimony, and no challenge is made to the substantial sufficiency of the evidence. 28 USCA § 391; Alwart Bros. Coal Co. v. Royal Colliery Co. (C. C. A. 7) 211 F. 313.

The remaining error relied upon is the charge of the court with respect to doctors' and hospital bills hereinabove set out. Consideration of this point will also dispose of assignments covering the admission of testimony of Dr. Ingle and Mrs. Wall, the nurse, by which the bills of doctor and hospital were shown to aggregate $1,871.10. Appellee is a married woman, and there is no evidence in this case that she paid, or incurred personal liability for, the medical and hospital bills made necessary by her injury. In such case the liability at common law rests primarily upon her husband. The right to recover for these items was in him and not in appellee. This rule prevails in Arkansas, as in other jurisdictions where Married Women's Acts have made no change in the liability of a husband for the necessaries of life of a wife. Beverly v. Nance, 145 Ark. 589, 224 S. W. 956; Irwin v. McDougal, 217 Mo. App. 645, 661, 274 S. W. 923; Galtney v. Wood, 149 Miss. 56, 115 So. 117; Rogers v. Village of Orion, 116 Mich. 324, 74 N. W. 463; Kenyon v. Vogel, 250 Mass. 341, 145 N. E. 462.

64

Counsel for appellee has made no attempt to detract from the force and authority of these cases, but says: "Whatever debts she has contracted for nurse's hire, doctors', and surgeons' bills and hospital bills is part of her general damages." As has been said, there is no evidence that she has paid or contracted for such bills, and we are therefore regretfully constrained to hold that she cannot recover therefor. If, within thirty days from the filing of this opinion, she shall file with the clerk of this court a remittitur in the sum of $1,871.10, the judgment, thus modified, will be affirmed; otherwise it must be reversed and the case remanded for a new trial. It is so ordered.